## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| **STEPHANIE BETH D.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 20-2622-JWL** |
| **KILOLO KIJAKAZI,**[2] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security denying Disability Insurance Benefits (DIB) pursuant to sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act).  Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

## I.    Background

_____

[1] The court makes all its "Memorandum and Order[s]" available online.  Therefore, in the interest of protecting the privacy interests of Social Security disability claimants, it has determined to caption such opinions using only the initial of the Plaintiff's last name.

[2] On July 9, 2021, Kilolo Kijakazi was sworn in as Acting Commissioner of Social Security.  In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ms. Kijakazi is substituted for Commissioner Andrew M. Saul as the defendant.  In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

Plaintiff protectively filed an application for DIB on April 5, 2018.  (R. 11, 200).
After exhausting administrative remedies before the Social Security Administration
(SSA), Plaintiff filed this case seeking judicial review of the Commissioner's decision
pursuant to 42 U.S.C. § 405(g).  Plaintiff claims the ALJ erred in failing to recognize
inconsistencies between the vocational expert (VE) testimony and information in the
Dictionary of Occupational Titles (DOT), in failing to perform a function-by-function
assessment of Plaintiff's functional limitations before assessing the ability to perform a
range of sedentary work, and the residual functional capacity (RFC) assessed is not
supported by substantial record evidence.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052
(10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he
findings of the Commissioner as to any fact, if supported by substantial evidence, shall be
conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual
findings are supported by substantial evidence in the record and whether he applied the
correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord,
White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  "Substantial evidence" refers to
the weight, not the amount, of the evidence.  It requires more than a scintilla, but less
than a preponderance; it is "such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see
also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).
Consequently, to overturn an agency's finding of fact the court "must find that the

evidence not only <u>supports</u> [a contrary] conclusion, but <u>compels</u> it." <u>I.N.S. v. Elias-</u>

<u>Zacarias</u>, 502 U.S. 478, 481, n.1 (1992) (emphases in original).

The court may "neither reweigh the evidence nor substitute [its] judgment for that

of the agency." <u>Bowman v. Astrue</u>, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting

<u>Casias v. Sec'y of Health & Human Servs.</u>, 933 F.2d 799, 800 (10th Cir. 1991)); <u>accord</u>,

<u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1172 (10th Cir. 2005); <u>see also</u>, <u>Bowling v. Shalala</u>,

36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record,

nor try the issues <u>de novo</u>, nor substitute [the Court's] judgment for the

[Commissioner's], even if the evidence preponderates against the [Commissioner's]

decision.") (quoting <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988) (brackets in

<u>Bowling</u>)).  Nonetheless, the determination whether substantial evidence supports the

Commissioner's decision is not simply a quantitative exercise, for evidence is not

substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.

<u>Gossett</u>, 862 F.2d at 804-05; <u>Ray v. Bowen</u>, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a

claim for disability.  20 C.F.R. § 404.1520; <u>Wilson v. Astrue</u>, 602 F.3d 1136, 1139 (10th

Cir. 2010) (citing <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a

determination can be made at any of the steps that a claimant is or is not disabled,

evaluation under a subsequent step is not necessary." <u>Wilson</u>, 602 F.3d at 1139 (quoting

<u>Lax</u>, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether

claimant has engaged in substantial gainful activity since the alleged onset, whether she

has a severe impairment(s), and whether the severity of her impairment(s) meets or

equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the process—determining at step four whether, considering the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, she is able to perform other work in the economy. Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC previously assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).  The court addresses the errors alleged in order as they would be reached when applying the sequential evaluation process rather than the order presented in Plaintiff's Social Security Brief.

## II.  Errors in Assessing RFC

### A.  Function-by-Function Assessment of Plaintiff's Abilities

Plaintiff argues, "The ALJ failed to assess the RFC on a function-by-function basis and erroneously assessed the exertional level first."  (Pl. Br. 35).  Plaintiff points

out the ALJ found she is able "to perform sedentary work as defined in 20 CFR

404.1567(a)."  (R. 16).  She then quotes that regulation's definition of sedentary work:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 405.1576(a).  She argues, "It is impossible to determine from this definition

how the ALJ assessed Plaintiff's actual ability to walk, sit, stand, push, and pull [and] is

clearly contrary to the mandate of SSR [(Soc. Sec. Ruling)] 96-8p" that the ALJ must

assess functional limitations on a function-by-function basis before expressing RFC in

terms of exertional level.  (Pl. Br. 35) (citing SSR 96-8p, paragraph 4).  She asserts, "the

ALJ failed to follow the correct legal test and erroneously assigned an exertional category

without first engaging in the requisite function-by-function assessment."  Id.

Plaintiff is correct that the regulation which defines sedentary work, 20 C.F.R.

§ 404.1567(a), does not specify the amount of time required for sitting, or for standing

and/or walking in sedentary work.  Rather, it defines a sedentary job as "one which

involves sitting," and notes that "walking and standing are required occasionally."  20

C.F.R. § 404.1567(a).  However, the regulations and rulings are based on the definition of

"occasionally" as involving up to one-third of the time and recognize that the full range

of sedentary work requires about six hours of sitting in an eight-hour workday, with

standing and/or walking occasionally, or about two hours in an eight-hour workday.

Therefore, there is no error in the ALJ's failure expressly to state that he found Plaintiff

can sit about six hours in an eight-hour workday or stand and/or walk about two hours in an eight-hour workday.  Moreover, although Plaintiff asserts a technical error in the ALJ's failure to expressly state the sitting and standing and/or walking requirements of sedentary work, she does not point to record evidence that she cannot meet those requirements.  Therefore, even if the court were to assume an error in this regard, Plaintiff has shown no prejudice resulting from the alleged error.  Finally, to the extent Plaintiff may be arguing that the ALJ did not specify her pushing or pulling capability, that argument misses the meaning of "exertion" in evaluating an exertional level. Exertion means "The action of exerting oneself; vigorous action; effort; an instance or mode of exerting oneself." <u>Oxford English Dictionary</u>, available online at: https://www.oed.com/view/Entry/66117 (last visited April 12, 2022). The ALJ found plaintiff is capable of the effort which sedentary work requires – a maximum exertion of 10 pounds of force.  Therefore, he found Plaintiff capable of exerting that force whether it be in lifting, carrying, pushing, or pulling.  There is no error in this regard.

### B. RFC Unsupported by Substantial Evidence

Plaintiff's argument in this regard is an argument that the ALJ erred in evaluating the medical opinions of her treating physicians.  (Pl. Br. 36-40).  She argues the ALJ erroneously ignored the August 9, 2013 opinion of her primary care physician at that time, Dr. Jordan.  <u>Id.</u> at 36-37.  She argues the ALJ also erred in finding unpersuasive the January 2020 retrospective opinions of her treating physicians, Dr. Evans and Dr. Stevens.  <u>Id.</u> at 37-40.

The Commissioner argues the August 9, 2013 opinion of Dr. Jordan is not a "medical opinion" within the meaning of the regulations (Comm'r Br. 6) (citing 20 C.F.R. § 404..1513(a)(2)) and that the ALJ properly evaluated the medical opinions.  Id. at 6-9.  In her Reply Brief, Plaintiff argues the August 9, 2013 opinion is a "medical opinion" and the ALJ ignored it despite the requirement he consider all record medical evidence.  (Reply 7).  She argues the Commissioner's argument regarding Dr. Jordan's opinion is a post hoc rationale which the court must reject.  Id.  Plaintiff reiterates her argument relating to Dr. Evans's and Dr. Stevens's opinions.  She concludes her argument by asserting she is not presenting evidence requesting the court to reach a different conclusion than did the ALJ, but that "[e]very treating physician who issued an opinion – Dr. Jordan, Dr. Evans, and Dr. Stevens – indicated limitations which would result in a finding of disabled."  Id. at 9.

### 1.    *Standard for Evaluating Medical Opinions*

Effective March 27, 2017, the regulations changed the standard for evaluating evidence, including medical opinion evidence.  In the new regulations, the Commissioner explicitly delineated five categories of evidence including objective medical evidence, medical opinion, other medical evidence, evidence from nonmedical sources, and prior administrative medical findings.  20 C.F.R. § 404.1513 (2017).  The regulations define objective medical evidence as "medical signs, laboratory findings, or both."  20 C.F.R. § 404.1513(a)(1) (2017).  "Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings,

diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 404.1513(a)(3)

(2017). "Evidence from nonmedical sources is any information or statement(s) from a

nonmedical source (including you) about any issue in your claim." 20 C.F.R.

§ 404.1513(a)(4) (2017).

The regulation defines "medical opinion:"

(2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: …

(i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2) (2017).

The regulations include a new section entitled "How we consider and articulate

medical opinions and prior administrative medical findings for claims filed on or after

March 27, 2017." 20 C.F.R. § 404.1520c (2017). The regulation provides that the

Commissioner "will not defer or give any specific evidentiary weight, including

controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a) (2017). The regulation provides that the SSA will consider each medical source's opinions using five factors; supportability, consistency, relationship of source to claimant, specialization, and other factors tending to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(a)(c)(1-5) (2017). It provides that the most important factors in evaluating persuasiveness are supportability and consistency. Id.

The regulation explains that the decision will articulate how persuasive the SSA finds all medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c(b) (2017). The articulation requirement applies for each source, but not for each opinion of that source separately. 20 C.F.R. § 404.1520c(b)(1) (2017). It requires that the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(2) (2017). The regulation explains that when the decision-maker finds two or more medical opinions or prior administrative medical findings are equal in supportability and consistency "but are not exactly the same," the decision will articulate the other most persuasive factors from paragraphs (c)(3) through (c)(5). 20 C.F.R. § 404.1520c(b)(3) (2017). Finally, the regulation

explains that the SSA is not required to articulate how it considered evidence from non-medical sources.  20 C.F.R. § 404.1520c(d) (2017).

### 2.    *The ALJ's Findings*

The ALJ explained his findings regarding the medical opinions and prior administrative medical findings and his conclusions regarding Plaintiff's allegations of disabling limitations:

> In making this finding, the undersigned finds the State agency consultants' opinions are unpersuasive because evidence received at the hearing level is sufficient from which to evaluate the claimant's physical and psychological functional capacity prior to the date last insured (Ex. 1A; 3A [R. 100-05, 108-15]).
>
> In October 2013, the claimant's then primary care provider, Dr. Jordan, opined the claimant could increase her activity as tolerated (Ex. 12F/11 [R. 378]).  This opinion is vague, but it is consistent with the claimant's activities of daily living, including her ability to walk her dogs, and her conservative treatment history.  It also suggests the claimant's symptoms would not preclude all basic work activity prior to September 30, 2013 (Ex. 12F/11 [R. 378]).
>
> In January 2020, the claimant's most recent neurologist and primary care provider opined the claimant became disabled as early as May 2013 (Ex. 21F; 20F; 19F; 18F [R 733-42]).  For instance, Dr. Evans opined the claimant could not walk even 1 city block, would miss more than 4 days of work per month and would be off task more than 25 percent of the workday beginning in May 2013 (Ex. 18F [R. 733-36]).  Dr. Stevens, her neurologist, opined the claimant could only sit 5 minutes at a time, could not complete an 8-hour workday without napping 2 or 3 times for 30 minutes at a time, would miss more than 4 days of work each month, would be off task more than 25 percent of the workday, and would need to walk around every 5 to 10 minutes to maintain wakefulness (Ex. 20F [R. 738-41]).  These restrictions are inconsistent with the claimant's conservative treatment history during the relevant period.  These restrictions are not consistent with the normal workup including detailed neurological examinations which failed to support any significant findings during the relevant period (Ex. 12F/13, 74; 15F/77 [R. 380, 441, 623]).  These providers did not evaluate or meet the claimant during the relevant period.

Dr. Stevens first met the claimant in December 2015, and Dr. Evans first met with the claimant in October 2014, more than one year after the date last insured.  Thus, these opinions are unpersuasive.

In summary, the claimant's allegations of total disability are out of proportion with the medical and other evidence of record.  Nevertheless, the undersigned finds the claimant's impairments require a reduction of the residual functional capacity.  The undersigned has determined the claimant's residual functional capacity based on the entire record, including the objective medical findings in the record, the clinical signs and findings on examination and the claimant's partially consistent testimony. Weighing all relevant factors, the undersigned finds that claimant's subjective complaints did not warrant any additional limitations beyond those established in the residual functional capacity previously outlined in this decision.

(R. 18-19).

### 3.    *Analysis*

In considering the ALJ's evaluation of Plaintiff's allegations of disability and the medical opinions related thereto, it is important to keep in mind the time period at issue here.  At issue is Plaintiff's April 2018 application for DIB alleging disability beginning May 1, 2013.  (R. 11, 200).  Moreover, as Plaintiff has acknowledged, her date last insured for DIB was September 30, 2013.  (R. 12, 63-65); see also (Pl. Br. 2).  Therefore, in order to be eligible for DIB the burden is on Plaintiff to show she was <u>disabled</u> beginning within that five-month period.  It is of no consequence if Plaintiff had an impairment during that five-month period which later became of disabling severity.

Of some concern to the court is the fact that Plaintiff alleges she became disabled five years before her application for disability.  In considering that fact, the court notes the ALJ discussed certain related facts:

> The claimant previously filed applications for disability and disability insurance benefit, which was [sic] denied at the initial level on October 7, 2014, and May 7, 2014. The undersigned finds the record does not indicate grounds for reopening the prior determination. The claimant's current application was not filed within 12 months of the previous determination (20 CFR 404.988). Furthermore, the record does not reveal fraud, an error on the face of the evidence, or any other grounds for reopening the claimant's prior denial. Nevertheless, the undersigned has considered the medical evidence as submitted for purposes of evaluating the claimant's functional capacity prior to the date last insured.

(R. 11-12). This discussion implies the ALJ did not reopen the earlier applications denying disability—apparently throughout the period at issue here. If that were the case, the earlier decisions would have been administrative res judicata prohibiting a subsequent finding of disability for the period at issue here. However, the ALJ proceeded, nonetheless, to consider the issue of disability in this period, thereby impliedly reopening the period at issue here. The court is unaware of the circumstances presented in the previous applications and neither party addresses this curious discussion, so the court considers it no more.

As to Dr. Jordan's opinion, the evidence supports the ALJ's finding that it is vague but consistent with claimant's activities and conservative treatment history during the five-month window at issue and suggests her "symptoms would not preclude all basic work activity prior to September 30, 2013." (R. 18). Plaintiff points to Dr. Jordan's annotation that she should continue to rest as needed, but "as needed" is a vague term as the ALJ noted and does not provide an explanation of the amount or frequency of rest Plaintiff needed while she was increasing her activity "as tolerated." (R. 378). Moreover, the ALJ found Plaintiff's allegations of symptoms "are not entirely consistent

with the medical evidence and other evidence in the record" (R. 16), that finding is

supported by record evidence, and Plaintiff does not argue otherwise.

Plaintiff argues that the ALJ ignored and did not consider Dr. Jordan's opinion

from August 9, 2013:

> that Plaintiff's condition significantly impacted her ability to attend class.
> Plaintiff had severe fatigue, low blood pressure requiring IV fluids on two
> occasions, decreased focus and mental cognition, and shortness of breath
> with minimal activity.  Her illness significantly impacted her ability to
> study and/or perform academically (impact on attention, memory, or
> executive functioning).  The severity of her illness led to decreased mental
> cognition and confusion, and she experienced decreased exercise tolerance.
> Her illness was expected to impact her ability to attend class/study for 12+
> weeks and it could take individuals as long as six months to recover from
> mono.  However, Plaintiff was now displaying other undiagnosed
> symptoms.  She was undergoing treatment/recovery that would impact her
> academic performance.  Her evaluation was ongoing, and the final
> diagnosis was not yet known.

(Pl. Br. 36-37) (citing R. 476).  Missing from Plaintiff's appeal is the explanation that this

"opinion" appears to be on a form providing a medical excuse for Plaintiff's missing

college class and is framed in the past tense.  For example, number 4 on the form asks,

"Based on the questions above, how long did the condition impact the student's ability to

attend class and/or their academic performance?"  (R. 476).  In response, Dr. Jordan

checked the boxes for both 5+ weeks and 12+ weeks.  Moreover, the form indicates it is

"MEDICAL ASSESSMENT FORM: PART II" and part I is not in the record.  Id.

Moreover, as the Commissioner points out, by definition a medical opinion is a

statement about what a claimant can still do, and the limitations and restrictions in her

ability to perform the physical, mental, or other demands of work, or to adapt to

environmental conditions.  20 C.F.R. § 404.1513(a)(2).  While the excuse form to which

Plaintiff appeals contains general statements regarding her symptoms and how they appeared at first to resolve but then worsened and "the final diagnosis is not known" (R. 476), what is missing is any statement regarding the limitations and restrictions in Plaintiff's ability to perform the physical, mental, or other demands of work, or to adapt to environmental conditions.  Further, to the extent this excuse form constitutes a medical opinion within the meaning of the regulations, Plaintiff has not shown that the ALJ ignored and did not consider it.  The ALJ stated he had "considered the medical opinions … in accordance with the requirements of 20 CFR 404.1520c."  The ALJ specifically mentioned Dr. Jordan's opinion from October 2013 and the regulation specifies that an ALJ is not required to address each opinion from a single source separately.  20 C.F.R. § 404.1520c(b)(1).  This opinion fits comfortably within the ALJ's statement of his evaluation of Dr. Jordan's other opinion—vague but consistent with Plaintiff's activities and conservative treatment history during the five-month window at issue and suggests her "symptoms would not preclude all basic work activity prior to September 30, 2013." (R. 18).  Moreover, in her treatment note from October 2013, Dr. Jordan stated Plaintiff "will be going back to school part time in January if she is feeling up to it."  (R. 378).

As to Dr. Evans's and Dr. Stevens's opinions, the ALJ found them unpersuasive because their "restrictions are inconsistent with the conservative treatment history during the relevant [five-month] period" (R. 18-19), are inconsistent with the normal workup and "detailed neurological examinations which failed to support any significant findings during the relevant period," id. at 19, and because Dr. Evans and Dr. Stevens did not begin treating or evaluate Plaintiff for more than a year after the date last insured.  Id.

14

Plaintiff argues that the failure to examine a claimant during the relevant period is not a valid reason to reject the physician's opinion and that a retrospective diagnosis is permissible evidence.  (Pl. Br. 37) (citing Andersen v. Astrue, 2009 WL 886237, at *9 (10th Cir. 2009); Gutierrez v. Colvin, 67 F. Supp. 3d 1198, 1203 (D. Colo. Sept. 9, 2014); Hoffman v. Apfel, 62 F. Supp. 2d 1204, 1212 (D. Kan. 1999).  She points to the physicians' review of the prior medical records and extensive examination and testing during the years they treated Plaintiff and argues they "were well acquainted with Plaintiff's medical history as well as the results of laboratory and clinical findings.  The ALJ has not given a legitimate reason to reject the opinions of Dr. Evans and Dr. Stevens."  Id. 38.

Plaintiff is correct that retrospective medical opinions are permissible, and in some cases necessary, in making a decision in a Social Security disability case.  However, as with all medical opinions they must be evaluated to consider the persuasiveness to be accorded the opinion.  By all accounts of these physicians, Plaintiff is currently disabled from her present condition.  But she has applied for DIB, not Supplemental Security Income.  To receive DIB, Plaintiff must show she was disabled before her date last insured resulting in the requirement in this case for Plaintiff to show onset of disability within the five-month period from May through September 2013.  Neither Plaintiff nor these physicians point to objective medical evidence ("medical signs, laboratory findings, or both." 20 C.F.R. § 404.1513(a)(1)) demonstrating onset of disability during the relevant period.  Therefore, the physicians rely on Plaintiff's report of symptoms (which, as noted above, the ALJ found not consistent with the record and Plaintiff has not denied)

during the relevant period to opine regarding disability during that period.  For example, Dr. Evans noted her opinion was "[b]ased on her [(Plaintiff's)] subjective history."  (R. 737).  She stated, "Dr. Stephens [sic] has documented that she suspects [Plaintiff's] case is related to the original viral illness in 2013."  Id.  She concluded, "Currently, [Plaintiff] is unable to work."  Id. (emphasis added).  Similarly, Dr. Stevens stated, Plaintiff's "symptoms began after a virus in May 2013."  Id. at 742.  She concluded, "I do believe that after her virus in May 2013 [Plaintiff] was very incapacitated and required assistance with her daily activities of life due to the atypical cataplexy."  Id.  However, Dr. Stevens stated that she diagnosed Plaintiff with atypical cataplexy and her initial exam of Plaintiff was in December 2015.  Id.  Because these physicians relied on Plaintiff's report of symptoms from 2013, because the record evidence from the relevant period does not support her report, and because Dr. Evans and Dr. Stevens did not examine Plaintiff until more than a year after her date last insured, that is a valid reason, among others, to find their opinions unpersuasive.

Plaintiff's appeal to the three cases cited in her Brief does not require a different result.  The unpublished Tenth Circuit opinion and two district court opinions are not precedent binding on this court.  Moreover, all three opinions were reached under the earlier regulations which were based upon a relative weighing of medical opinions and before the new regulations which require the adjudicator to evaluate the persuasiveness of the opinions of each medical source separately.  The court does not find those courts' opinions persuasive here.  Plaintiff has shown no error in the ALJ's evaluation of the opinion evidence to support an assertion of error in the RFC assessed.

16

### III.    Inconsistencies Between VE Testimony and Information in the DOT

Plaintiff argues that two of the representative jobs relied upon by the ALJ in finding work in the national economy which Plaintiff could perform—charge account clerk (DOT 205.367-014) and order clerk (DOT 209.567-014)—require abilities beyond the RFC assessed.  She alleges these jobs require a "temperament" of "Attaining precise set limits, TOLERANCES, and standards" which exceeds Plaintiff's limitation from fast-paced production requirements.  (Pl. Br. 32 (citing Sandra H. v. Comm'r of Soc. Sec., No.: 2:17-CV-403-FVS, 2019 WL 289811, at *7 (E.D. Wash. Jan. 22, 2019); and Ryan Patrick A. v. Berryhill, 2019 WL 1383800, at *6 (C.D. Calif. Mar. 27, 2019)).  She also argues both jobs require General Educational Development (GED), reasoning level 3 which is inconsistent with the simple work to which the ALJ limited Plaintiff.  Id. at 32-33.  Finally, she argues all three jobs relied upon are at least reasoning level 2 which requires "the ability to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.'"  Id. at 33 (citing R.S. v. Saul, No. 20-2416-SAC, 2021 WL 2156412, at *9 (D. Kan. May 27, 2021), and quoting without citation from the DOT occupational definition of Reasoning level 2 for the job of a stuffer (DOT 731.685-014)).

The Commissioner does not concede but assumes for the sake of argument Plaintiff is correct that the ALJ erred in finding Plaintiff can perform the jobs as a charge account clerk and an order clerk.  (Comm'r Br. 10-11).  She argues that even so, he did not err in relying on the stuffer occupation of which there are 101,176 jobs in the national

economy.  Id.  She argues this job, by itself, constitutes a significant number of jobs of which Plaintiff is capable and justifies the ALJ's step five finding.  Id. at 12-13.  In her Reply Brief, Plaintiff reiterates her earlier arguments (Reply 1-3) and argues the ALJ did not make a finding that the stuffer job by itself constituted a significant number of jobs "and the Court should decline to do so as this is a factual issue for the ALJ."  Id. at 4 & n.3 (citing and quoting without pinpoint citation Allen v. Barnhart, 357 F.3d 1140 (10th Cir. 2004)).

Plaintiff's argument regarding "temperaments" is unsupported by the DOT.  Both jobs at issue here contain a line in the DOT definition trailer stating, "T: Attaining precise set limits, TOLERANCES, and standards."  DICOT 205.367-014, DICOT 209.567-014, 1991 WL 671715.  The DOT does not label this as a "temperament" and does not explain the meaning of the phrase or suggest that it relates in any way to fast-paced production requirements.  Dictionary of Occupational Titles, available online at Dictionary of Occupational Titles DOT - Job Descriptions - www.occupationalinfo.org (last visited, April 18, 2022).  Plaintiff did not cite or provide the court with any authority supporting her understanding of "temperaments," and the cases she cited in support are neither binding on or persuasive to this court.  For these reasons, the court uses this rationale as no part of its determination the ALJ erred in relying on these jobs in his decision.

The Tenth Circuit however, in a published opinion, has held that the limitation to simple and routine work tasks "seems inconsistent with the demands of level three reasoning."  Hackett, 395 F.3d at 1176.  Although this court disagrees with the reasoning of the Tenth Circuit in this regard, Carolyn J. S. v. Saul, Civ. A. No. 18-4049-JWL, 2019

WL 2523575 at *3 (D. Kan. June 19, 2019) (agreeing with the well-reasoned decision in

<u>Rom v. Colvin</u>, No. 15-CV-402-FHM, 2016 WL 3528059 at *3 (N.D. Okla. June 23,

2016); <u>see also</u>, <u>Karen Jean M. v. Saul</u>, Civ. A. No. 19-2455-JWL, 2020 WL 5057488, at

*12-14 (D. Kan. Aug. 27, 2020) (discussing the interplay among Specific Vocational

Preparation, General Educational Development, and Reasoning levels 1-3), <u>Hackett</u> is

precedent binding on this court and the court holds that the representative jobs requiring

reasoning level three, charge account clerk and order clerk, are beyond the RFC assessed

for Plaintiff and were erroneously relied upon by the ALJ.

As Plaintiff points out the job as a stuffer requires reasoning level 2 or the ability

to "[a]pply commonsense understanding to carry out detailed but uninvolved written or

oral instructions.  Deal with problems involving a few concrete variables in or from

standardized situations."  (Pl. Br. 33) (quoting the reasoning level 2 requirements from

the job description of a stuffer, DOT 731.685-014).  Plaintiff argues that because she is

limited "to simple, repetitive, routine tasks with simple, work-related decisions and few,

if any, workplace changes" she is unable to meet the requirements of reasoning level 2 as

quoted above.  (Pl. Br. 33).  The court disagrees.  Plaintiff includes only about half of the

mental RFC assessed by the ALJ; "able to apply common sense understanding to carry

out detailed, but uninvolved, instructions in the performance of simple, routine, and

repetitive tasks in a work environment free of fast-paced production requirements

involving only simple, work-related decisions with few, if any, workplace changes."  (R.

16) (finding no. 5, bold omitted).  Although it does not parrot the DOT, this RFC is well

19

within the requirements of reasoning level 2. Plaintiff has not shown a conflict between the RFC assessed by the ALJ and the DOT definition of the stuffer job.

Because the Commissioner argues the ALJ's error in including the reasoning level three jobs was harmless, the only remaining question for the court is whether the 101,176 stuffer jobs in the national economy is a significant number of jobs. Plaintiff argues the ALJ did not make that finding with regard to the stuffer job standing alone and the court should not either because that is a factual issue reserved to the ALJ. (Reply 4) (citing without pinpoint citation Allen v. Barnhart, 357 F.3d 1140(10th Cir. 2004)).

As Plaintiff suggests, the court in Allen recognized it is the ALJ's responsibility to make the factual determination whether a job exists in significant numbers. Allen, 357 F.3d at 1144 (citing Trimiar v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1992); and Drapeau v. Massanari, 255 F.3d 1211, 1214 (10th Cir. 2001)). The court recognized, however, that "it nevertheless may be appropriate to supply a missing dispositive finding under the rubric of harmless error in the right exceptional circumstance, i.e., where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." Allen, 357 F.3d at 1145. Many courts in this circuit have applied harmless error analysis in situations such as this where one or more of the representative jobs relied upon by the ALJ were erroneously considered.

Here, the ALJ considered the stuffer occupation and found that it represented 101,176 jobs in the national economy available to Plaintiff. (R. 20). The question before the court is whether that number alone represents a significant number of jobs. The

Tenth Circuit has refused to draw a bright line to establish the number of jobs which

constitute a "significant number."  Trimiar, 966 F.2d at 1330.  But it has applied harmless

error analysis and concluded no reasonable factfinder could find an insignificant number

of jobs where there were 650,000 jobs available in the national economy, Anderson v.

Colvin, 514 F. App'x. 756, 764 (10th Cir. April 4, 2013); 500,000 jobs, Bainbridge v.

Colvin, 618 F. App'x  391-92 (10th Cir. July 7, 2015); 215,000 jobs, Shockley v. Colvin,

564 F. App'x. 935, 940-941 (10th Cir. April 29, 2014); 212,000 jobs, Chrismon v.

Colvin, 531 F. App'x. 893, 899-900 (10th Cir. Aug. 21, 2013); and 152,000 jobs, Stokes

v. Astrue, 274 F. App'x. 675, 683-684 (10th Cir. April 18, 2008).  However, in Chavez v.

Barnhart, 126 F. App'x. 434, 436-437 (10th Cir. Feb. 3, 2005) the court found 49,957

jobs in the national economy (and 199 in the region) is insufficient to be considered a

significant number as a matter of law and refused to find harmless error.  Thus, the

question is whether a number of jobs in the national economy in excess of 49,957 but less

than 152,000 can be considered significant as a matter of law.

This court has determined that it could not find 55,000 jobs in the national

economy is a significant number as a matter of law.  Vyskocil v. Astrue, Civ. A. No. 11-

1135-JWL, 2012 WL 2370200 at *3 (D. Kan. June 22, 2012); and Judge Crow has found

that 59,000 is too low a number, Quintana v. Colvin, No. 14-1134-SAC, 2015 WL

4664980 at *6 (D. Kan. Aug. 6, 2015).  In 2015, Judge Melgren found that 500 jobs in

Kansas and 115,000 nationally is too low a number to find significant as a matter of law.

Thomas v. Astrue, No. 11-1348-EFM, 2013 WL 5524602 at *4 (D. Kan. Oct. 4, 2013).

In 2020, Judge Vratil was presented with a case in which there were 45,000 document

preparer jobs in the national economy available to the plaintiff.  Harrison v. Saul, Civ. A. No. 19-1202-KHV, 2020 WL 1847735, *2 (D. Kan. April 13, 2020).  The court recognized the Tenth Circuit in Chavez found that 49,957 was too low a number to find significant as a matter of law but distinguished that case because it had focused on the 199 cases existing in the region, noted that in Harrison "no record evidence suggests any potential shortage of jobs regionally," and found the 45,000 jobs nationally was a significant number.  Id. 2020 WL 1847735, *6-7.

The court finds the answer to the question is in the affirmative and the number here is significant as a matter of law.  The number here is midway between the lowest number of jobs found by the Tenth Circuit to be a significant number as a matter of law in Stokes, 152,000, and the number of jobs it has found too low to be a significant number as a matter of law in Chavez—49,957.  In fact, it is more than twice the number of jobs available in Chavez.  Moreover, as was the case in Harrison, no record evidence suggests any potential shortage of jobs regionally.  The court finds that no reasonable factfinder could find that 101,176 stuffer jobs is not a significant number in the circumstances of this case.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated April 18, 2022, at Kansas City, Kansas.

<u>s/ John W. Lungstrum</u>
**John W. Lungstrum**
**United States District Judge**